1

**PAUL E. QUADE, ESQ.**
2     Nevada State Bar No. 5465
**LAW OFFICES OF PAUL E. QUADE, P.C.**
3     216 East Liberty Street
Reno, Nevada 89501
4     Telephone:     (775) 329-8679

5
Attorneys for Plaintiff/Counter-Defendant,
6     SIMON CHEFFINS and GREGORY JONES

7

8                         UNITED STATES DISTRICT COURT

9                              DISTRICT OF NEVADA

10                                      * * *

11

SIMON CHEFFINS and GREGORY             **CASE NO.:    3:09-cv-00130**
12    JONES,

13              Plaintiffs/Counter-Defendants,    **MOTION TO AMEND JUDGEMENT/**
**ORDER DENYING PLAINTIFFS'**
14    vs.                                          **MOTION FOR PARTIAL SUMMARY**
**JUDGMENT (VARA); AND GRANTING**
15    MICHAEL B. STEWART and DOES                  **DEFENDANT MOTION FOR**
I-V, Inclusive,                              **SUMMARY JUDGMENT; MOTION**
16                                                 **FOR ENTRY OF FINAL JUDGEMENT**
17              Defendant/Counter-Plaintiffs,     **AS TO THE VARA CLAIM**

18    _____/

19              **COMES NOW** Plaintiffs/Counter-Defendants SIMON CHEFFINS and GREGORY

20    JONES, pursuant to Federal Rule of Civil Procedure 59(e) and hereby move to alter or amend this

21    Honorable Court's Order Denying Plaintiffs' Motion for Partial Summary Judgment (VARA); and,

22    Granting Defendant's Motion for Summary Judgment.  Alternatively, Plaintiffs hereby request this

23    Court enter an order pursuant to Federal Rules of Civil Procedure 54(b) and 58 and enter final
24
judgement as to  the VARA claim so the same may be considered by the Ninth Circuit Court of
25
Appeals on interlocutory appeal.
26

27    / / /

28    / / /

1    This motion is supported by the Memorandum of Points and Authorities filed herewith; and,

2    the records and files of this case; as well as upon any testimony or evidence that may be presented

3    to this Honorable Court at time of hearing on the matter.

4         **RESPECTFULLY SUBMITTED** this **17**st day of **February, 2011.**

5

6                                                        **LAW OFFICES OF PAUL E. QUADE, P.C.**

7

8                                                        /s/
                                                         **PAUL E. QUADE, ESQ.**
9                                                        Attorney for Plaintiffs/Counter-Defendants,
                                                         SIMON CHEFFINS and GREGORY JONES
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

It should be noted at the outset that during the status hearing and trial setting in this matter held on February 17, 2011, the undersigned indicated that the instant Motions would be filed on today's date in accordance with the relevant statutory authority.  In response thereto, this Honorable Court indicated that both the instant Motions would be denied and that it would be a "waste of paper" to file the same.  The undersigned firmly believes that the instant Motions are well founded in law and fact and that these statements by the Court demonstrate a pre-decision on the merits without consideration of the relevant legal authority and facts.  Notwithstanding the apparently unwavering reality, as expressed by the Court, that he will "deny" the instant Motions the undersigned will file the same to preserve Plaintiffs' statutory and appellate rights.  The pre-decision on the instant Motions will be the subject of another, forthcoming motion once a recording of the hearing is obtained and the same is transcribed.

**II.   LEGAL AUTHORITIES**

Federal Rule of Civil Procedure 54 provides in relevant part:

(a) Definition; Form. "Judgment" as used in these rules includes a decree and any order from which an appeal lies. A judgment must not include recitals of pleadings, a master's report, or a record of prior proceedings.

(b) Judgment on Multiple Claims or Involving Multiple Parties. When an action presents more than one claim for relief--whether as a claim, counterclaim, crossclaim, or third-party claim--or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

© Demand for Judgment; Relief to Be Granted. A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other

final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.

Fed. R.Civ. P. 54.

United States Code § 1292 provides in relevant part:

(a) Except as provided in subsections © and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:
   (1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;
   (2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;
   (3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

© The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction–
   (1) of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title [28 USCS § 1295]; and
   (2) of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

28 USCS § 1292.

/ / /

/ / /

- 4 -

Federal Rule of Civil Procedure 58 provides:

(a) Separate Document. Every judgment and amended judgment must be set out in a separate document, but a separate document is not required for an order disposing of a motion:
(1) for judgment under Rule 50(b);
(2) to amend or make additional findings of fact under Rule 52(b);
(3) for attorney's fees under Rule 54;
(4) for a new trial, or to alter or amend the judgment, under Rule 59; or
(5) for relief under Rule 60.

(b) Entering Judgment.
(1) Without the Court's Direction. Subject to Rule 54(b) and unless the court orders otherwise, the clerk must, without awaiting the court's direction, promptly prepare, sign, and enter the judgment when:
(A) the jury returns a general verdict;
(B) the court awards only costs or a sum certain; or
© the court denies all relief.
(2) Court's Approval Required. Subject to Rule 54(b), the court must promptly approve the form of the judgment, which the clerk must promptly enter, when:
(A) the jury returns a special verdict or a general verdict with answers to written questions; or
(B) the court grants other relief not described in this subdivision (b).

© Time of Entry. For purposes of these rules, judgment is entered at the following times:
(1) if a separate document is not required, when the judgment is entered in the civil docket under Rule 79(a); or
(2) if a separate document is required, when the judgment is entered in the civil docket under Rule 79(a) and the earlier of these events occurs:
(A) it is set out in a separate document; or
(B) 150 days have run from the entry in the civil docket.

(d) Request for Entry. A party may request that judgment be set out in a separate document as required by Rule 58(a).

Fed.R.Civ.P. 58.

Federal Rule of Civil Procedure 59 provides:

(a) In General.
(1) Grounds for New Trial. The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows:
(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or
(B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

(2) Further Action After a Nonjury Trial. After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.

(b) Time to File a Motion for a New Trial. A motion for a new trial must be filed no later than 28 days after the entry of judgment.

© Time to Serve Affidavits. When a motion for a new trial is based on affidavits, they must be filed with the motion. The opposing party has 14 days after being served to file opposing affidavits. The court may permit reply affidavits.

(d) New Trial on the Court's Initiative or for Reasons Not in the Motion. No later than 28 days after the entry of judgment, the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion. After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion. In either event, the court must specify the reasons in its order.

(e) Motion to Alter or Amend a Judgment. A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

Fed.R.Civ.P. 59.

The Visual Artist Rights Act of 1990, 17 U.S.C. § 101, provides in relevant part:

A "work of visual art" is--
  (1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or
  (2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

A work of visual art does not include--
  (A) (I) any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;
    (ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;
    (iii) any portion or part of any item described in clause (I) or (ii);
  (B) any work made for hire; or

/ / /

(C)  any work not subject to copyright protection under this title.

17 U.S.C. § 101 (1990).

> Reconsideration is indicated in the face of the existence of new evidence, an intervening change in the law, or as necessary to prevent manifest injustice. See Mustafa v. Clark County Sch. Dist., 157 F.3d 1169, 1178-79 (9th Cir. 1998). Whether or not to grant reconsideration is committed to the sound discretion of the court. See Kona Enter., Inc. v. Estate of Bishop, 229 F.3d 877, 883 (9th Cir. 2000).

*Navajo Nation v. Norris*, 331 F.3d 1041, 1046 (9th Cir. Wash. 2003)

## III.   ARGUMENT

### A.   MOTION TO AMEND

The instant Motion to Amend this Court's Order (Document No. 79) is "appropriately brought under either Federal Rule 59(e) or Federal Rule 60(b)" *Taylor v. Knapp*, 871 F.2d 803, 805 (9th Cir. Nev. 1989), *cert. denied*, 493 U.S. 868, 110 S. Ct. 192, 107 L. Ed. 2d 146 (1989). Reconsideration or amendment of this Court's Order under Fed.R.Civ.P. 59(e) is appropriate in this case because in holding that La Contessa was a piece of "applied art" the Court apparently disregarded the numerous opinions expressed by Plaintiffs' experts (Document Nos. 25-31; 35; 47-51) and the opinion of the artist himself that La Contessa was a mobile, kinetic sculpture.

Indeed, SIMON CHEFFINS himself created an "issue of fact" that should not be decided under Rule 56 when he answered "No" to Mr. Low's query: "Do you believe that this is a work of applied art?" (Cheffins Depo. p. 43, ll. 22-24).

More to the point related to the legal standards applied, such a finding would constitute "manifest injustice" if Plaintiffs were not allowed to proceed on their VARA claim.  The Ninth Circuit Court of Appeals has recognized three justifications for reconsideration under Rule 59(e): 1) an intervening change in controlling law; 2) the availability of new evidence; and 3) the need to prevent manifest injustice.  *Navajo Nation v. Confederated Tribes and Bands of the Yakama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003).

Regrettably and erroneously this Honorable Court found La Contessa to be a work of applied art *as a matter of law* essentially because: "La Contessa was built on top of a bus and retained the bus' innate function of movement and transport. . . . By virtue of its retention of the ability to move and transport people, however, slowly, it remained a utilitarian object and thus constituted applied art." (Order, p. 8, ll. 6-14.)  Moreover this Court held as a matter of law that "because it was a venue for performances, such an object is also functional and would constitute applied art, as well." (Order, p. 8, ll. 14-17).

Notwithstanding the fact, and because, reasonable minds may disagree as to these conclusions, an issue addressed *infra*, the Court has usurped the jury function.:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (U.S. 1986); *Dairy Am., Inc. v. New York Marine & Gen. Ins. Co.*, 2010 U.S. App. LEXIS 26773 (9th Cir. Cal. Dec. 16, 2010)("[T]his court must draw all justifiable inferences in the non-moving party's favor.")

Not only do we have Mr. CHEFFINS' opinion related to the fact that La Contessa was not applied art we have the opinions of all of Plaintiffs' experts, not one of them that refer to La Contessa as an amazing piece of "applied art".  The inference reached therefrom, which must be drawn in favor of Plaintiffs: La Contessa is not applied art.  Indeed, the reality that noone, except perhaps a small-minded hired gun/art dealer, in the art world would consider La Contessa as applied art makes the ruling in that regard "manifest injustice." *Navajo Nation v. Confederated Tribes and Bands of the Yakama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003).  The basis for this factual distinction is two-fold as it applies to the Court's rationale in this regard.

/ / /

First, when the Court finds that because it retained "the ability to move and transport people" that La Contessa was applied art completely misses the definition of applied art. As argued exhaustively in prior motions and during oral argument on this matter the school bus underlying La Contessa lost its function as a school bus.[1] The chopper or juicer or vase or chair that possess such craftsmanship as to make the same a "piece of art" does not lose it's function as it's intended utilitarian purpose. The jump from school bus to ability to transport people is logically flawed for two reasons: 1) As previously argued La Contessa was no longer a school bus in any real sense and the fact it could move and transport people does not change that fact; 2) La Contessa's ability to move was part of it's aesthetic appeal which made it even more imaginative and artistic. Attached hereto as Exhibit A is the Affidavit of Joanne S. Northrup, a previously noticed expert. Paragraph 10 and 13 of said Affidavit brings this point home:

> 10.    Your Affiant is aware that All "Mutant Vehicles" at Burning Man are produced primarily for aesthetic reasons, and their primary purpose is to visually delight audiences—the enchanting vision of a Spanish Galleon seeming to "sail" across the desert is most compelling. The function of all Mutant Vehicles, including *La Contessa*, is not intrinsically utilitarian. It is rather a moving sculpture.

> 13.    Your Affiant believes that *La Contessa* should be protected under VARA because it is a sculpture that resembles a 16th Century Spanish Galleon. However the transportation of people is not its innate function; its innate function is aesthetic in nature and its mobility adds to that aesthetic and does not transform *La Contessa* into a utilitarian object.

(Affidavit of Joanne S. Northrup pp. 2 and 3).

Second, the Court's finding "because it was a venue for performances, such an object is also functional and would constitute applied art, as well" is internally contradictory and in contradiction to the relevant case law on the subject. *Carter v. Helmsley-Spear*, 71 F.3d 77, 83 (2d Cir. N.Y.

---

[1] Indeed, as noted in the depositions of Simon Cheffins and Greg Jones the interior of the bus was completely gutted, the seats removed, a hole cut in the roof. Indeed, "the interior of the bus was also an important part of it. The interior was built out to look like the interior of a ship, like the inside of a hull of a ship." (Cheffins Depo., p. 28, ll. 20-23).

1995).  By the Court's own rationale the original utilitarian object, a school bus, had been transformed to something else completely.  Even assuming the overly broad definition adopted by this Court, transforming a school bus into some other form of utilitarian transportation, a venue for performances was not the original design function of the utilitarian object.  The undersigned cannot fathom a scenario under which the original designers and engineers contemplated that their school bus would be used as "one of the materials used in making" La Contessa that also could be utilized as a venue for performance art.  La Contessa created a remarkably imaginative and artistic aesthetic that enhanced the experience of those performances.  Therefore, the original utilitarian object, a school bus, has and was transformed into something completely different.  A fact that is indisputable.  Certainly a fact that creates a legitimate issue in dispute and favorable inference that should be left to the jury.

Notwithstanding the Court's already expressed intention to deny the instant Motion, the undersigned respectfully submits that if the Order (Document No. 79) is allowed to stand that the same would constitute manifest injustice under VARA which essentially is designed to protect the moral rights of the authors of art work.  Indeed, the remarkably narrow definition of La Contessa as applied art misses the entire intent of the art piece and the reason VARA was enacted:

> **Interpreting applied art to include such works would render meaningless VARA's protection for works of visual art installed in buildings. A court should not read one part of a statute so as to deprive another part of meaning. See, e.g., United States Nat'l Bank of Or. v. Independent Ins. Agents of America, Inc., 124 L. Ed. 2d 402, 113 S. Ct. 2173, 2182 (1993); United States v. LaPorta, 46 F.3d 152, 156 (2d Cir. 1994).**

*Carter v. Helmsley-Spear*, 71 F.3d 77, 83 (2d Cir. N.Y. 1995)(emphasis added).  Although not quoted previously the undersigned believes it important that this Court once again consider the legislative and "moral" underpinnings of VARA as so eloquently expressed by the *Carter* Court:

/ / /

I Artists' Moral Rights

A. History of Artists' Moral Rights

Because it was under the rubric of the Visual Artists Rights Act of 1990 that plaintiffs obtained injunctive relief in the district court, we must explore, at least in part, the contours of that Act. In doing so it is necessary to review briefly the concept of artists' moral rights and the history and development of those rights in American jurisprudence, which led up to passage of the statute we must now examine.

The term "moral rights" has its origins in the civil law and is a translation of the French le droit moral, which is meant to capture those rights of a spiritual, non-economic and personal nature. The rights spring from a belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved. See Ralph E. Lerner & Judith Bresler, Art Law 417 (1989) (Art Law). Because they are personal to the artist, moral rights exist independently of an artist's copyright in his or her work. See, e.g., 2 Nimmer on Copyright 8D-4 & n.2 (1994) (Nimmer).

While the rubric of moral rights encompasses many varieties of rights, two are protected in nearly every jurisdiction recognizing their existence: attribution and integrity. See Art Law at 420. The right of attribution generally consists of the right of an artist to be recognized by name as the author of his work or to publish anonymously or pseudonymously, the right to prevent the author's work from being attributed to someone else, and to prevent the use of the author's name on works created by others, including distorted editions of the author's original work. See, e.g., id. at 419-20; Nimmer at 8D-5. The right of integrity allows the author to prevent any deforming or mutilating changes to his work, even after title in the work has been transferred. See, e.g., Art Law at 420.

In some jurisdictions the integrity right also protects artwork from destruction. Whether or not a work of art is protected from destruction represents a fundamentally different perception of the purpose of moral rights. If integrity is meant to stress the public interest in preserving a nation's culture, destruction is prohibited; if the right is meant to emphasize the author's personality, destruction is seen as less harmful than the continued display of deformed or mutilated work that misrepresents the artist and destruction may proceed. See Art Law at 421; see also 2 William F. Patry, Copyright Law and Practice 1044 n.128 (1994) (Copyright Law) (noting the different models but suggesting that "destruction of a work shows the utmost contempt for the artist's honor or reputation").

Although moral rights are well established in the civil law, they are of recent vintage in American jurisprudence. Federal and state courts typically recognized the existence of such rights in other nations, but rejected artists' attempts to inject them into U.S. law. See, e.g., Vargas v. Esquire, Inc., 164 F.2d 522, 526 (7th Cir. 1947);

Crimi v. Rutgers Presbyterian Church, 194 Misc. 570, 573-76, 89 N.Y.S.2d 813 (N.Y. Sup. Ct. 1949). Nonetheless, American courts have in varying degrees acknowledged the idea of moral rights, cloaking the concept in the guise of other legal theories, such as copyright, unfair competition, invasion of privacy, defamation, and breach of contract. See Nimmer at 8D-10; Art Law at 423.

In the landmark case of Gilliam v. American Broadcasting Companies, Inc., 538 F.2d 14 (2d Cir. 1976), we relied on copyright law and unfair competition principles to safeguard the integrity rights of the "Monty Python" group, noting that although the law "seeks to vindicate the economic, rather than the personal rights of authors . . . the economic incentive for artistic . . . creation . . . cannot be reconciled with the inability of artists to obtain relief for mutilation or misrepresentation of their work to the public on which the artists are financially dependent." Id. at 24. Because decisions protecting artists rights are often "clothed in terms of proprietary right in one's creation," we continued, "they also properly vindicate the author's personal right to prevent the presentation of his work to the public in a distorted form." Id.

Artists fared better in state legislatures than they generally had in courts. California was the first to take up the task of protecting artists with the passage in 1979 of the California Art Preservation Act, Cal. Civ. Code § 987 et seq. (West 1982 & Supp. 1995), followed in 1983 by New York's enactment of the Artist's Authorship Rights Act, N.Y. Arts & Cult. Aff. Law § 14.03 (McKinney Supp. 1995). Nine other states have also passed moral rights statutes, generally following either the California or New York models. See generally Art Law at 430-35; id. at 301-09 (Supp. 1992) (describing the different states' laws).

B. Visual Artists Rights Act of 1990

Although bills protecting artists' moral rights had first been introduced in Congress in 1979, they had drawn little support. See Copyright Law at 1018 n.1. The issue of federal protection of moral rights was a prominent hurdle in the debate over whether the United States should join the Berne Convention, the international agreement protecting literary and artistic works. Article 6bis of the Berne Convention protects attribution and integrity, stating in relevant part: Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation. Berne Convention for the Protection of Literary and Artistic Works, September 9, 1886, art. 6bis, S. Treaty Doc. No. 27, 99th Cong., 2d Sess. 41 (1986).

The Berne Convention's protection of moral rights posed a significant difficulty for U.S. adherence. See Copyright Law at 1022 ("The obligation of the United States to provide droit moral . . . was the single most contentious issue surrounding Berne adherence."); Nimmer at 8D-15 ("During the debate over [the Berne Convention Implementation Act], Congress faced an avalanche of opposition to moral rights, including denunciations of moral rights by some of the bill's most vociferous

advocates."); H.R. Rep. No. 514, 101st Cong., 2d Sess. 7 (1990), reprinted in 1990 U.S.C.C.A.N. 6915, 6917 ("After almost 100 years of debate, the United States joined the Berne Convention . . . . Consensus over United States adherence was slow to develop in large part because of debate over the requirements of Article 6bis.").

Congress passed the Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853 (1988), and side-stepped the difficult question of protecting moral rights. It declared that the Berne Convention is not self-executing, existing law satisfied the United States' obligations in adhering to the Convention, its provisions are not enforceable through any action brought pursuant to the Convention itself, and neither adherence to the Convention nor the implementing legislation expands or reduces any rights under federal, state, or common law to claim authorship of a work or to object to any distortion, mutilation, or other modification of a work. See id. §§ 2, 3; see also S. Rep. No. 352, 100th Cong., 2d Sess. 9-10 (1988), reprinted in 1988 U.S.C.C.A.N. 3706, 3714-15.

Two years later Congress enacted the Visual Artists Rights Act of 1990 (VARA or Act), Pub. L. No. 101-650 (tit. VI), 104 Stat. 5089, 5128-33 (1990). Construing this Act constitutes the subject of the present appeal. The Act protects both the reputations of certain visual artists and the works of art they create. It provides these artists with the rights of "attribution" and "integrity." . . .These rights are analogous to those protected by Article 6bis of the Berne Convention, which are commonly known as "moral rights." The theory of moral rights is that they result in a climate of artistic worth and honor that encourages the author in the arduous act of creation. H.R. Rep. No. 514 at 5 (internal quote omitted). The Act brings to fruition Emerson's insightful observation.

Its principal provisions afford protection only to authors of works of visual art -- a narrow class of art defined to include paintings, drawings, prints, sculptures, or photographs produced for exhibition purposes, existing in a single copy or limited edition of 200 copies or fewer. 17 U.S.C. § 101 (Supp. III 1991). With numerous exceptions, VARA grants three rights: the right of attribution, the right of integrity and, in the case of works of visual art of "recognized stature," the right to prevent destruction. 17 U.S.C. § 106A (Supp. III 1991). For works created on or after June 1, 1991 -- the effective date of the Act -- the rights provided for endure for the life of the author or, in the case of a joint work, the life of the last surviving author. The rights cannot be transferred, but may be waived by a writing signed by the author. Copyright registration is not required to bring an action for infringement of the rights granted under VARA, or to secure statutory damages and attorney's fees. 17 U.S.C. §§ 411, 412 (1988 & Supp. III 1991). All remedies available under copyright law, other than criminal remedies, are available in an action for infringement of moral rights. 17 U.S.C. § 506 (1988 & Supp. III 1991). With this historical background in hand, we pass to the merits of the present litigation.

*Carter v. Helmsley-Spear*, 71 F.3d 77, 81-83 (2d Cir. N.Y. 1995).

With all due respect to this Honorable Court, finding that VARA does not protect such an

- 13 -

amazing art piece as La Contessa because it is applied art is "manifest injustice" in contravention of the very intent of VARA and must be remedied.

## B.   MOTION TO DIRECT ENTRY OF JUDGMENT AND FOR INTERLOCUTORY APPELLATE CERTIFICATION

Federal Rule of Civil Procedure 54(b) provides

> (b) Judgment on Multiple Claims or Involving Multiple Parties. When an action presents more than one claim for relief--whether as a claim, counterclaim, crossclaim, or third-party claim--or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

This Court's Order (Document No. 79) dismissed Count I of Plaintiffs' Complaint in it's entirety.  "Fed. R. Civ. P. 54(b) allows the district court to sever a final judgment with respect to particular claims (or parties) for an immediate appeal." *James v. Price Stern Sloan*, 283 F.3d 1064, 1066, fn. 4 (9th Cir. Wash. 2002).  Moreover, this ruling essentially undermines Plaintiffs' entire case as a state conversion claim cannot adequately address the monumental public policy issues presented by this litigation.  The two claims are simply not entwined as to the legal issues presented.  Indeed, the undersigned believes that the Court will ultimately strike most if not all of Plaintiffs' proposed experts which bring home the importance of this litigation.  As such, the undersigned believes that the trial currently scheduled for August 1, 2011, will be fruitless and a waste of time and resources.  With that said the undersigned will meet his professional responsibilities and do everything in his power to protect his clients' interests and the important public policy issues presented by this case notwithstanding the likelihood that they will not be allowed under the conversion claim standing alone.

/ / /

/ / /

/ / /

This Court should also consider the following language of the Ninth Circuit Court of Appeals in considering a motion brought pursuant to Rule 54(b) in relation to such a request brought under 28 U.S.C. § 1292:

> Some of our cases use the phrase" Rule 54(b) certification." E.g., Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 923 (9th Cir. 2001); Holley v. Crank, 258 F.3d 1127, 1130 (9th Cir. 2001); Brookes v. Comm'r, 163 F.3d 1124, 1129 (9th Cir. 1998); Int'l Techs. Consultants, Inc. v. Pilkington PLC, 137 F.3d 1382, 1386 (9th Cir. 1998); Zucker v. Maxicare Health Plans, Inc., 14 F.3d 477, 483 (9th Cir. 1994). This is a misnomer born of confusion between Rule 54(b) and 28 U.S.C. § 1292(b), only the latter of which requires a certification. The two procedures apply to different situations. See generally 10 Charles Alan Wright et al., Federal Practice and Procedure § 2658.2, at 89-95 (1998) [hereinafter Wright & Miller]. **Rule 54(b) applies where the district court has entered a final judgment as to particular claims or parties, yet that judgment is not immediately appealable because other issues in the case remain unresolved. Pursuant to Rule 54(b), the district court may sever this partial judgment for immediate appeal whenever it determines that there is no just reason for delay**. A court of appeals may, of course, review such judgments for compliance with the requirements of finality, but accords a great deference to the district court. Texaco, Inc. v. Ponsoldt, 939 F.2d 794, 797-98 (9th Cir. 1991).
>
> By contrast, section 1292(b) addresses the situation where a party wishes to appeal an interlocutory order, such as pertaining to discovery, see Tennenbaum v. Deloitte & Touche, 77 F.3d 337, 338-39 (9th Cir. 1996), denying summary judgment, Brewster v. Shasta County, 275 F.3d 803, 805 (9th Cir. 2001), denying a motion to remand, Lee v. Am. Nat'l Ins. Co., 260 F.3d 997, 1000 (9th Cir. 2001), or decertifying a class, Smith v. Univ. of Wash., Law School, 233 F.3d 1188, 1192-93 (9th Cir. 2000). Normally, such interlocutory orders are not immediately appealable. In rare circumstances, the district court may approve an immediate appeal of such an order by certifying that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Even where the district court makes such a certification, the court of appeals nevertheless has discretion to reject the interlocutory appeal, and does so quite frequently. See 16 Wright & Miller § 3929, at 363.
>
> Section 1292(b) is a departure from the normal rule that only final judgments are appealable, and therefore must be construed narrowly. This explains the reasons for the specific form of the certification required of the district court and de novo review thereof by the court of appeals. See, e.g., In re Cement Antitrust Litig. (MDL No. 296), 673 F.2d 1020, 1026 (9th Cir. 1982). By contrast, a Rule 54(b) severance is consistent with the final judgment rule because the judgment being severed is a final one, whose appeal is authorized by 28 U.S.C. § 1291. **Referring to a Rule**

> **54(b) severance order as a "certification" misleadingly brings to mind the kind of rigorous judgment embodied in the section 1292(b) certification process. In reality, issuance of a Rule 54(b) order is a fairly routine act that is reversed only in the rarest instances**. See, e.g., In re First T.D. & Inv., Inc., 253 F.3d 520, 531-33 (9th Cir. 2001); Ariz. State Carpenters Pension Trust Fund v. Miller, 938 F.2d 1038, 1040 (9th Cir. 1991).

*James v. Price Stern Sloan*, 283 F.3d 1064, 1068 (9th Cir. Wash. 2002)(emphasis added). Therefore, there is nothing unusual about such the request and under the circumstances presented by this case the interlocutory consideration of the VARA claims should be granted.

As expressed today, February 17, 2011, in open court during the status hearing/trial setting the undersigned will appeal the "applied art" ruling in Document No. 79 to the Ninth Circuit Court of Appeals regardless of the outcome of the conversion trial.  This is true whether or not Plaintiffs prevail during that trial.  Indeed, the law and relevant facts are distinguishable between the two claims.  In the undersigned's humble opinion this ruling cannot stand as it is not supported in law or fact and must be litigated until all options are exhausted or until a favorable outcome is obtained. The appellate issues presented by the dismissal of the VARA claim are completely independent of the remaining conversion case and should be decided sooner rather than later.  It is in the interests of smooth and efficient judicial administration of this case and there is no just reason to delay the Ninth Circuit considering the same. "A court uses a two-step process under Rule 54(b): (1) it determines if the challenged order is a "final judgment"; and (2) it determines whether there is any just reason for delay. *Souza v. United States*, 2010 U.S. Dist. LEXIS 110264 (D. Nev. Oct. 1, 2010). Because of their importance the VARA issues should be presented and decided without undue delay.  Therefore, the undersigned respectfully submits that this Court should enter an interlocutory judgement in this case pursuant to Rules 54(b) and 58 in order to allow this matter to proceed to the Ninth Circuit Court of Appeals to decide the VARA issues presented by this case.

/ / /

1

2

**WHEREFORE,** Plaintiffs SIMON CHEFFINS and GREG JONES respectfully submit they are entitled to relief under Fed.R.Civ.P 59(e) or alternatively Fed.R.Civ. P. 54(b).

3

**RESPECTFULLY SUBMITTED** this **17**th day of **February, 2011.**

4

**LAW OFFICES OF PAUL E. QUADE, P.C.**

5

6

/s/ _____

7

**PAUL E. QUADE, ESQ.**
Attorney for Plaintiffs/Counter-Defendants,

8

SIMON CHEFFINS and GREGORY JONES

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

    Pursuant to FRCP 5(b), I certify that I am an employee of the LAW OFFICES OF PAUL

3

E. QUADE, P.C., 216 East Liberty Street, Reno, Nevada 89502, and that on this date I caused to

4

be delivered via electronic mail a true and correct copy of the foregoing **Motion to Amend**

5

**Judgment/Order Denying Plaintiffs' Motion for Partial Summary Judgment (VARA); and**

6

**Granting Defendant Motion for Summary Judgment; Motion for Entry of Final Judgment**

7

**as to the VARA Claim** addressed as follows:

8

9
                     Keegan G. Low, Esq.
                     Robison, Belaustegui, Sharp & Low

10
                     71 Washington Street
                     Reno, Nevada 89503

11

12

    **DATED** this **17**th day of **February**, **2011.**

13

14

15
                     /s/ _____
                     **Carol Elewski**

16

17

18

19

20

21

22

23

24

25

26

Z:\La Contessa\Pleadings\P-Motion.Reconsideration.02.16.11.wpd

27

28